

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

July 5, 2017

**BY ECF**

The Honorable Jesse M. Furman
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

    Re:    *United States* v. *Emils Mors*, 16 Cr. 692-01 (JMF)

Dear Judge Furman:

    The defendant in this case, Emils Mors, is scheduled to be sentenced on July 13, 2017 at 3:30 p.m., having pled guilty to conspiracy to commit wire fraud. The Government respectfully submits this letter in advance of the sentencing. Pursuant to a plea agreement between the parties, the United States Sentencing Guidelines ("Guidelines") range is 57 to 71 months' imprisonment. For the reasons set forth below, the Government submits that a sentence within the Guidelines range is warranted in this case.

    **A. Offense Conduct**

    This case involves a wire fraud and money laundering conspiracy by a network of individuals located in New York and overseas. The conspiracy has targeted victims principally through variations on an internet fraud: a member of the conspiracy posts an advertisement for a boat or car for sale on Craigslist. Often these advertisements use the names of real automobile dealerships to lend credibility to the postings. When prospective buyers respond to these advertisements, members of the conspiracy negotiate with them over email—again, often using email accounts set up in the names of real car dealerships—and provide bank wiring instructions to the buyers. After paying, though, the expectant buyers never receive any vehicles.

    Victims of this scheme typically do not realize that they have been defrauded for a matter of days. And during that period, members of the conspiracy withdraw the funds wired by victims into the bank accounts specified in the fraudulent emails to those victims. Those bank accounts have been set up by individuals recruited from Baltic countries, who travel to the United States, open bank accounts in the names of fictitious corporations, and then wait to withdraw victims' funds as soon as they are deposited into these accounts. Once the funds are withdrawn, they are laundered oversees.

    Emils Mors is one of those individuals who opened bank accounts and withdrew victims' funds. Mors was recruited in Latvia to travel to the United States and earn money by opening bank

accounts to "clean" the funds that were wired into those accounts. (U.S. Probation Office's Final Presentence Report, dated June 26, 2017 ("PSR"), ¶ 11). Mors was promised, upon his return to Latvia, that he would receive ten percent of any money he withdrew from the bank accounts he had set up. (*Id.*) Mors arrived in the United States in November 2015 and immediately began opening bank accounts in the name of Bianza Corp. (*Id.* ¶ 12.) Mors set up bank accounts at multiple financial institutions, including TD Bank, Wells Fargo, Bank of America, Citibank, and JPMorgan Chase. On the account opening documents, Mors described Bianza Corp. as an online seller of vintage boats and other antique items, and stated that the business was located in Brooklyn. (*Id.* ¶ 14.) Bianza Corp., though, existed in name only: it was not involved in any form of online business, and did not have a physical location.

Mors monitored these accounts for activity and, on occasion, was informed by Janis Klava—one of his co-conspirators and a defendant in this case—when Mors should look for funds in his account. (*Id.* ¶ 13.) Klava drove Mors to bank locations in Manhattan and Brooklyn, where Mors withdrew money from his accounts in increments ranging from $6,000 to $9,000. (*Id.*) Mors withdrew the funds in amounts less than $10,000 to avoid scrutiny from the banks and account closures. (*Id.*) For instance, Mors opened an account at TD Bank in December 2015 in the name of Bianza Corp. (*Id.* ¶ 14.) In January 2016, the TD Bank account received wire transfers from individuals who were victims of the Craigslist scams described above. (*Id.* ¶ 15.) After the victims' funds were wired into the TD Bank account, Mors made structured withdrawals at branch locations around New York. Mors himself withdrew approximately $140,000 from accounts he set up. He knew that the funds he was withdrawing were derived from a variety of Internet fraud schemes. (*Id.* ¶ 13.)

Mors did not work alone. When he came to the United States, he was picked up Klava, who Mors considered his boss. Klava gave Mors instructions about how to set up bank accounts and evade detection by law enforcement. Mors gave much of the money he withdrew to Klava, who laundered the funds. Mors worked with Klava and about five to ten other individuals from Latvia and Lithuania who were in their group. The group traveled between hotels in New York and New Jersey, rented cars, and paid for their expenses using the proceeds of their fraud and stolen credit card numbers they purchased on the Internet.

### B. Procedural History

On September 19, 2016, at approximately 10:00 p.m., the Hanover Township Police Department went to the American Best Value Inn in Whippany, New Jersey, on an unrelated matter. (*Id.* ¶ 10.) Mors approached the officers and told them that individuals were attempting to kidnap him. (*Id.*) According to Mors, he had told his co-conspirators that he wished to return to Latvia, and then they threatened his life. It is not clear that Mors was being entirely truthful in this regard. In attempting to corroborate Mors's story, the Government has learned that Mors may have been intoxicated, got into an argument with a co-conspirator, and then approached the police. In any event, Mors approached Hanover Township police officers, confessed his involvement in a wire fraud, and agreed to go with the officers to the police department. (*Id.*) At the police department, Mors was advised of his *Miranda* rights and then, over a series of two days, on video tape, he described the wire fraud conspiracy outlined in this submission.

On September 22, 2016, Mors was charged by Complaint with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349. On the same day, he was presented before Magistrate Judge Sarah Netburn and was bailed. Mors immediately expressed an interest in continuing to cooperate with law enforcement, met briefly with the Government the day he was charged, and agreed to meet with the Government again on September 26, 2016—the same day he was scheduled to meet with his pretrial services officer. Mors, however, absconded.

On October 19, 2016, Mors was charged in a two-count sealed Indictment with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and bail jumping, in violation of 18 U.S.C. § 3146(a)(1) and (b)(1)(A)(i). Mors was arrested on November 29, 2016 in Atlantic City, New Jersey, presented on the Indictment, and detained. Between September 22, 2016, when Mors was released on bail, and November 29, 2016, when Mors was arrested, he rejoined the conspiracy and continued to perpetrate the wire fraud described herein. In fact, following his first arrest, Mors rose to the level of supervisor in the conspiracy, overseeing the activities of other individuals from Latvia and Lithuania who were opening bank accounts.

Despite his prior willingness to assist the Government in its investigation, following his second arrest, Mors was no longer open to cooperating. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████

On April 4, 2017, the defendant pled guilty to Count One of the Indictment—conspiracy to commit wire fraud. In the Plea Agreement, the parties agreed that the Guidelines range is 57 to 71 months' imprisonment. (*Id.* ¶ 5.) The defendant also agreed to forfeiture in the amount of $133,462. (*Id.* ¶ 5m.) On June 26, 2017, the U.S. Probation Office ("Probation") issued the final Presentence Investigation Report. Probation recommends a sentence of 57 months' imprisonment and no supervision to follow. (PSR pp. 17-18.)

### C. Discussion

A significant sentence of incarceration is necessary in this case to reflect the seriousness of the defendant's offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence to this defendant and other similarly situated individuals, and to protect the public. *See* 18 U.S.C. § 3553(a)(2)(A)-(C). All of these considerations weigh heavily in favor of a substantial sentence—one within the Guidelines range of 57 to 71 months' imprisonment.

*First*, a significant prison sentence is necessary to reflect the seriousness of the defendant's conduct, to promote respect for the law, and to provide just punishment. The conspiracy outlined herein resulted in millions of dollars in losses to consumers, with over one hundred thousand dollars of those losses directly attributable to the defendant. While the defendant was not involved in posting fraudulent advertisements on the Internet, he was necessary to launder the funds and was aware that they were procured by fraud. Without the defendant—and those like him—there would have been no way to withdraw the money victims sent into bank accounts controlled by the

conspiracy. Many of these victims devoted considerable savings to the purchases of automobiles and boats—savings that were taken by the defendant and sent overseas.

*Second*, a significant sentence of imprisonment is necessary to afford adequate deterrence to the defendant. After the defendant was arrested in September 2016, he absconded and rejoined the conspiracy. His arrest alone had no deterrent effect on his behavior. Quite the opposite, the defendant was promoted within the conspiracy, rising to the level of a supervisor after his arrest. This conduct displays a startling disregard for the seriousness of the charges he was facing, and for the orders of the Court. A significant sentence is necessary to deter the defendant against returning to the conspiracy. A substantial term of imprisonment is also warranted for purposes of general deterrence. Mors, and others like him, was recruited to come to the United States to open bank accounts, earn money, and then return to Latvia. Believing there is little downside to becoming involved in this scheme, many young individuals from Baltic states have come to the United States to serve as "money mules," always intending to return to their native country. A significant sentence in this case is necessary to send a message to these would-be "money mules" that there are serious consequences, apart from deportation, associated with this type of fraud and money laundering activity.

*Third*, with respect to relative culpability, this defendant is properly viewed as a mid-level manager in the conspiracy. While he was not the leader of the U.S.-based money laundering operation, he was involved in that operation for over a year, and directed the actions of others. The defendant is not, as defense counsel suggests, a "foolish boy." After being arrested for his involvement in a wire fraud conspiracy, the defendant fled, rejoined the conspiracy, and assumed a greater role.

## **Conclusion**

For the foregoing reasons, the Government respectfully submits that a sentence within the Guidelines Range of 57 to 71 months' imprisonment is appropriate.

        Very truly yours,

        JOON H. KIM
        Acting United States Attorney

by: _____
        Thane Rehn
        Danielle R. Sassoon
        Nicolas Landsman-Roos
        Assistant United States Attorney
        (212) 637-2354 /1115/2421

Cc: Steven R. Kartagener, Esq. (by email)